Weldon, J.,
delivered the opinion of the court:
On the 19th day of May, 1891, the claimant filed a petition in which he in substance alleged that the Ute Indians on the 13th day of July, 1865, in the county of Sevier, in the Territory of Utah, destroyed, shot, and took from his possession (he then being a resident of said county and Territory and a citizen of the United States) a certain amount of property, consisting of horses, oxen, cattle, corn, wheat, oats, wagon, *537 and household goods, which amounted in the aggregate to the sum of $520. There is also included in the account embraced m his petition an item of $150 for services as a minutemau for six months. On the 20th of September, 1893, by leave of the court, claimant amended his petition, in which amended petition he alleges the depredation to have been committed by the Ute Indians, and in which he omitted from the claim the item of $150 for services as a minuteman.
To the amended petition the defendants file the general issue, and insist that the evidence is not sufficient to justify the court in finding that the claimant suffered the loss as alleged in the first item of the claim, and that at the time of the alleged depredation the Indians charged were not in amity with the United States.
If the contention of the defendants prevail on the last issue, it is wholly immaterial whether the loss occurred or not, as the jurisdiction of the court fails, and no further inquiry need be made as to the claim.
The time of the alleged depredation is the 13th day of July, 18C5, and the place Sevier County, in the Territory of Utah.
At that time the county of Sevier was sparsely populated, and whatever property there was in the county was an easy prey to Indians, whether they were actuated by the spirit of plunder and theft or the hostile purpose of war and devastation. The county is about 200 miles south of Salt Lake City, and not far from a range of mountains on the west, which gave to marauders or hostiles safe retreat from the scenes of their pillage and destruction. The alleged depredation was committed by what at that time was properly known as Black Hawk’s band.
In the discussion and decision of the question of amity two inquiries arise: First, was Black Hawk’s band a band within the meaning of the first section of the act conferring jurisdiction on this court to adjudicate claims arising from Indian depredations; and, second, if so, was the band at the time of the depredation in amity with the United States within the meaning of that term as used in the law?
The statute in effect provides that suit may be brought against any band, tribe, or nation in amity with the United States for depredations committed by Indians belonging to such band, tribe, or nation.
*538 By this provision are recognized three classifications of identities, which, with the United States, may become defendants in a proceeding to recover satisfaction for an Indian depredation; and if the depredation can be traced to such band, tribe, ór nation, either acting in its unity or by the individual members of the band, tribe, or nation in amity, the plaintiff’s right to recover is established.
Some difficulty has arisen in the construction of that part of the statute which defines who and what are to be recognized as having the legal characteristics of a defendant within the meaning of the law.
The word nation may and often does include a large number of bands and tribes having no connection with each other either in fact or law, and having such severed relations to each other as to destroy all responsibility for each other’s depredations. The nations, tribes, and bands have been differentiated by numerous decisions of the court according as they have been recognized in law and as they have existed in fact.
A band, being the lowest and smallest subdivision, confederates more readily than any other form of corporate existence, so to speak, and maybe composed of Indians of different tribes or nations, and becomes a de facto band by the extent of its membership, its continuity of existence, and its persistent cohesion, subject to the control and power of a leader having the recognized authority of a commander and chief.
The different divisions of the Indians have not usually originated from the conventional mode which organizes white persons into political communities, but have originated as a condition in fact, and when so existing they are recognized by the laws and treaties as a separate entity, and held responsible as such.
In the case of Woolverton (29 C. Cls. R., 107) the suit was against the Nez Percé Indians, and the proof showed that the depredation was committed by a band of those Indians which had become disconnected with the tribe and had been recognized as such, and the court held that there was no liability on the part of the tribe, and as the band was at the time in a state of hostility with the United States a judgment was given for the defendants.
In the case of Montoya v. The Mescalero Apache Indians (ante, p. 349) the depredating Indians were what was known as Victoria’s band, who had under him as a leader a minority of *539 the Chirieuahua tribe of Apaches, a minority of the Mesealeros, Southern Apaches, and a number of unknown Indians from Mexico, making in all at the time of the depredation about 200 Indians, and the court held that although composed of a minority of different tribes which were at peace with the United States his following constituted a band within the meaning- of the act giving this court jurisdiction, and as it was not at peace with the United States there was no liability on the part of the United States and the Mescalero tribe of Indians.
In the case of Woolverton, Joseph’s band had been in exist, ence much longer than JBlack Hawk’s band, the alleged depre-dators in this case, and had been formally recognized by the United States; but in the case of Victoria’s band it did not differ in substantial particulars from the band alleged to have committed the injury complained of in this proceeding.
The evidence shows that the first manifestation of hostility by the band known as Black Hawk’s was in the early spring of 1S65 in the county in which it is alleged the property of the claimant was stolen. The depredations were not confined to that particular county, but during the continuance of the troubles several counties in that part of the Territory suffered in the theft of stock, the burning of houses, and the killing of many of the settlers. - \
In the report of the Secretary of the Interior for 1865 it is stated:
“During the past year the Indians have been peaceful, with the exception of the difficulties with a band of outlaws in San-pete Valley, mentioned in my letter of the 28th April last. At that time I requested the military authorities to send a sufficient force to protect the settlers and to arrest the offending Indians. This was refused, and the settlers were left to take care of themselves. They organized a force of about 80 men and drove the Indians back to Grand Biver, killing about one-third of the number of those who were engaged in committing the depredations (p. 314).”
In the Keport of the Commissioner of Indian Affairs for 1866 it is stated:
“Early in the spring advices were received that Black Hawk, an influential chief of the San Pitch band of Utahs, had taken the field with an active band of followers, and had killed many of the settlers and driven off a large amount of valuable stock. In the conflicts which ensued some forty of the Indians were *540 killed, but the chief was joined by wild spirits of outlaws from various bands, and, thus recruited, renewed bis raid upon tlie settlers (p. 31).”
Superintendent Head, on April 30,1866, addressed the Com. missioner of Indian Affairs as follows:
“Black Hawk, a somewhat prominent chief of the Utah Indians, has been engaged for more than a year past in active hostilities against the settlers in the southern portion of this Territory. His baud consisted at first of-but 44 men, who were mostly outlaws and desperate characters from his own and other tribes. During the summer and autumn of 1865 he made several successful forays upon the weak and unprotected settlements in Sanpete and Sevier counties, killed in all 32 whites, and drove away to the mountains upward of 2,000 cattle and horses.
“Forty of his warriors were killed by the settlers in repelling his different attacks. His success in stealing, however, enabled him to feed abundantly and mount all Indians who joined him, and the prestige acquired by his raids was such that his numbers were constantly on the increase, despite his occasional losses of men. He spent the winter near where the Grand and Green rivers unite to form the Colorado. On the 20th instant he again commenced his depredations by making an attack upon Salina, a small settlement in Sevier County. He succeeded in driving to the mountains about 200 cattle, killing 2 men who were guarding them, and compelling the abandonment of the settlement.
“His band, from what I consider entirely reliable information, now numbers 100 warriors, one-half of whom are Navajoes from New Mexico. I am very apprehensive that unless Black Hawk is severely chastised an Indian war of considerable magnitude may be inaugurated * * * (p. 128).”
On page 129 of the same publication is given another report from Superintendent Head regarding the hostility of Black Hawk and his band.
On page 124 the same superintendent reports:
“A small band of outlaws, under the command of a chief named Black Hawk, have been engaged in hostilities for nearly two years. Their number did not at first exceed 50 men, and in various skirmishes which have taken place nearly that number have been killed, but accessions have been continually had from among the more reckless Indians of the different bands, so that their number has increased to about 60 men. They have made raids upon several of the small and defenseless settlements in the southern portion of the Territory for the purpose of stealing cattle and horses, fighting when pursued by the settlers, who sought to recover their stock. During the *541 present year they have made two sucb raids upon tbe settlements of Salina and Round Valley, stealing in each instance nearly 200 cattle and borses. I applied in April last to tbe officer in command of tbe United States forces at Camp Douglass, in this Territory, asking bimto station one or two companies of soldiers in tbe southeastern portion of tbe Territory to protect tbe settlers. He was not able to do so, however, as be was expecting that all bis command, being volunteers, would shortly be mustered out of service.”
Tbe Commissioner of Indian Affairs, in 1867, says of Black Hawk :
“In my last annual report mention was made of a series of depredations by Black Hawk, a hostile Utah chief, who, with a small band of outlaws from tbe different tribes of Utah Indians, was engaged in active hostilities (p. 178).”
In 1868 the same superintendent (Head), under date of September 16, 1868, reporting to tbe Commissioner of Indian Affairs, said:
“In some of bis raids during the years 1865,1866, and 1867 Black Hawk bad engaged with him some of the wild Ifflk Mountain Utes and Shebaretehes. Some of tbe latter tribe, after Black Hawk bad made peace, commenced to steal (p. 612).”
House Mis. Doc. No. 99, second session, Fortieth Congresses a memorial of tbe legislative assembly of Utah Territory to Congress, asking compensation in tbe sum of $1,500,000 for tbe suppressing of tbe Indian hostilities in the years 1865,1866, and 1867. In that memorial it is said:
“ During this war Sevier and Piute counties were abandoned by six extensive and flourishing settlements, it being considered impracticable to defend them there. Their removal was effected at tbe loss of nearly all they had, their stock and teams being mostly stolen and driven away by tbe Indians, and they were removed by tbe citizens of Sanpete County. Likewise four settlements on the borders of Sanpete County were broken up and removed at much expense and loss; also fifteen settlements in Iron, Kane, and Washington counties, besides two or three small settlements in Wasatch County.” (See also Laws of Utah, 1868, chap. 39.)
In House Mis. Doc. 19, first session Forty-first Congress,' appears another memorial of tbe legislative assembly of Utah Territory for an appropriation to pay for Indian depredations and expenses incurred in suppressing Indian hostilities. Tbe statement and prayer of tbe memorial is as follows:
“ Your memorialists, tbe governor and legislative assembly of tbe Territory of Utah, would most respectfully represent to *542 your honorable body that for the last three years we have bad a vexatious Indian war on our hands, the seat of which bas been in Sevier, Piute, and Sanpete counties, extending more or less to the counties of Wasatch, Utah, Millard, Beaver, Iron, Washington, and Kane, rendering a strong military force constantly necessary in the held. Colonel Irish, former superintendent of Indian affairs, called on General Conner to protect the settlements of this Territory from Indian depredations. The general replied that if those depredations were committed upon any settlements along the overland mail line he would protect them, but if on settlements remote from said line he could not do it.
u Colonel Head, present superintendent of Indian affairs, called on Colonel Porter to protect the settlements of this Territory where Indian hostilities existed. Colonel Porter sent East for instructions in the case, and received answer from General Sherman that we must rely on the militia of the Territory.
*#**#*#
“In this war we have furnished our own soldiers, arms, ammunition, transportation, cavalry horses, and supplies for the years 1865-66 and 67. We have borne a heavy burden, and we ask for compensation and aid, as most of our citizens at and near the seat of this war have become greatly reduced and impoverished thereby; and likewise the other settlements that have had to remove are more or less so.
“ We therefore ask your honorable body to appropriate $1,500,000 to compensate the citizens for their services, transportation, and supplies in suppressing Indian hostilities in the Territory of Utah during the years before named, or so much thereof as will cover these expenses, as per vouchers and testimonies now in the Adjutant-General’s Office, which will accompany this our memorial or follow it at an early day. And your memorialists, as in duty bound, will ever pray.”
In Bancroft’s History of Utah it is stated (pp. 632-633):
“ In April, 1865, an Indian war broke out in Sanpete County, spreading to adjacent districts and lasting without intermission until the close of 1867, under the leadership of a chieftain named Black Hawk. Although the militia of the southern counties were strongly in the field, and reenforcements were sent from Salt Lake City under General Wells, the California volunteers being then disbanded, more than fifty of the Mormon settlers were massacred, an immense quantity of live stock captured, and so widespread was the alarm that many of the southern settlements were for a time abandoned, the loss to the community exceeding $1,100,000.”
The memorial of the legislative assembly of Utah embraces a statement of the expenditures of the Territory incident to *543 the trouble with the Indians during the years 1865, 1866, and 1S67; the sum of $39,986 was expended in the year 1865, §623,458 in 1866, and in the year 1867 $448,592, aggregating more than one million of dollars during the three years. The vouchers indicate an expenditure as early as April, 1865, and from that time until the close of the troubles in 1867 the large expenditure was made, as alleged by the memorial of the legislature in seeking reimbursement for the Territory. During the years over which the troubles extended hostile engagements took place between the Indians, under Black Hawk, and the citizens and the soldiers, under the direction of the authorities of the Territory. It is alleged by the memorialist that on the 10th of April, 1865, a number of companies were mustered into the service, marched to Salina, 65 miles, in time to reenforce Oapt. N. S. Beach, and with him went in pursuit and overtook the Indians and gave them battle, killing and wounding several of them.
The document alleges the organization at different times, commencing in April, 1865, and ending in July, 1867, of a large number of companies and their disbandment in November, 1867.
During that period several engagements took place between the troops of the Territory and the Indians, under the leadership of Black Hawk, in which many soldiers and Indians were ( killed. From the data furnished by the memorial the different conflicts with the Indians may be stated as follows:
At Thistle Creek Canyon, June 1, 1867; at .Twelve Mile Creek, June 2, 1867; at Springtown, August 13,1867, and at Fountain Green during the same year.
The latest conflict between the Indians and the militia was on the 13th August, 1867, although the militia of the Territory was not disbanded until November, 1867.
On August 22, 1867, the Indian agent, in his report, says that he has just returned from an interview with Black Hawk, in the course of which he stated “he has pledged himself to immediately return to liis band, stop all depredations, and meet me with all the Indians heretofore hostile upon the United States reservation.” (Beport of Commissioner of Indian Affairs, 1867, p. 178.)
The first loss complained of was on the 25th of July, 1865, and the second on the 13th of April, 1866.
At the time of the second loss the claimant had started from Glenwood, m company with three others, and on the morning *544 of the 13tb of April, while in camp near Salina, they were attacked by Indians, led by Black Hawk and White Horse Chief. On the approach of the Indians the claimant and those with him started for the town of Salina, not far distant, expecting to.be assisted by the inhabitants. The Indians killed the herder of a flock of sheep not far from where they took and destroyed the property of the claimant, which consisted of oxen, wheat, and oats. They put the cattle of claimant with others and started for the mountains.
During the time of the troubles covered by the period of Black Hawk’s depredations, raids, and hostilities that part of the country was substantially devastated, and in Sanpete and Sevier counties alone, as shown by the report of the superintendent, Head, 32 white persons were killed and upward of 2,000' head of cattle and horses driven away. By the same report 40 of his warriors were killed by the settlers in different attacks, but so successful were his raids that the number of Black Hawk’s followers were increased, notwithstanding his losses. The settlements were broken up and the occupation of the country practically abandoned. Superintendent Head, in April, 1866, applied to the officer in command of the United States forces, asking him to protect the settlers, but the officer was unable to do so.
In April, 1865, by the report of the Secretary of the Interior, it is shown that a request was made on the military authorities to send a forpe to protect the settlers, but the assistance was not given and the settlers were compelled to protect themselves, and for that purpose organized a force of about 80 men and drove the Indians back to the Grand Biver, killing about one-third of those engaged in the depredations.
The proof does not show that a majority of the Utes or any other tribe, band, or nation was with Black Hawk, but that he was a somewhat prominent chief of the Utah Indians is shown by Superintendent Head; that he was an influential chief of the San Pitch band of Utahs is also stated, and as such that he was engaged u in active hostilities against the settlers in the southern portion of the Territory.” That he was influential in fact is shown by the history of his operations, the sacrifice of life, and expenditures incident to the protection of the people against his inroads and invasions. He was the leader of a de facto band, recognized as such by the officers of *545 tbe United States, and recognized in fact by the formidable opposition to bis encroachments.
Upon the faith of the facts appearing in this case we determine that in law, and in fact, the followers of Black Hawk constitute a band, as did Victoria’s.
The Commissioner of Indian Affairs in 1867 says of Black Hawk:
“In my last annual report mention was made of a series of depredations by Black Hawk, a hostile Utah chief, who, with a small band of outlaws from the different tribes of Utah Indians, was engaged in active hostilities.”
The suit is against the United States and the Ute Indians, without designation beyond that, and the venue of the alleged depredation in Sevier County, in the Territory of Utah. The proof shows beyond question that the alleged taking and destruction was by Black Hawk’s band, which for a period of nearly three years terrorized the people of that part of the Territory by warlike and hostile demonstrations; so much so that the settlements became a desolation, and the people by organized association and the authorities of the Territory by its militia became and were military belligerents against the Indians. It is true that no engagement ever took place between Black Hawk’s band’ and the military forces of the United States. For reasons not material to know, notwithstanding application was made for military aid from the United States, none was given. But does the failure to give military assistance by the United States establish amity on the part of the band?
As alleged in the memorial on the 10th day of April, 1865, a number of companies were mustered into the service; marched to Salina, 65 miles, to reenforce Captain Beach, and went with him in pursuit and overtook the Indians, gave them battle, killing and wounding several of them. The town of Salina is near where the Indians attacked the claimant and took and destroyed his property. The pursuit by Captain Beach was before the alleged depredation, and the Indians were the same band. The force of Black Hawk varied in numbers from 40 to 200, and were composed of Indians of different tribes. The general condition of the country as affected by the raids of the Indians and their engagement in hostilities with the citizens an d the militia of the Territory are shown in other cases covering the *546 same time, and to tbe testimony in sucb cases it is proper for ns to refer in order to ascertain a general condition not depending upon tbe specific facts of a particular case. Each case must be determined by its own testimony as to specific facts; but upon tbe general question of amity, it is proper for us to consider tbe general facts incident to cases belonging to tbe same class, as belonging substantially to tbe same period.
Tbe condition of Black Hawk’s band was a condition of hostility to tbe inhabitants of tbe Territory of Utah, and being hostile to them tbe band was not in amity with tbe United States within tbe meaning of tbe act of March, 1891. Tbe defendant Indians, tbe Utes, did not commit tbe depredation within tbe intent of tbe same statute, and under tbe decision in Montoya’s Case (ante, p. 349) and are not responsible for it, and tbe petition is therefore dismissed.